IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CA No. 3:21-CV-00112

| | | |
|---|---|---|
| CHRISTOPHER HOLLIS, HERMAN PURVIS, and VERAKA STURDIVANT, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | **COLLECTIVE AND CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| VALLEY PROTEINS, INC., | ) ) | |
| *Defendant.* | ) ) ) | |

COME NOW, Plaintiffs Christopher Hollis, Herman Purvis, and Veraka Sturdivant (collectively "Named Plaintiffs"), by and through counsel, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby set forth this collective action for violation of the Fair Labor Standards Act under § 216(b), and a representative action under the North Carolina Wage and Hour Act pursuant to Fed. R. Civ. P. 23 against Defendant Valley Proteins, Inc. (hereinafter "Defendant"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of Defendant's systemic, company-wide willful failure to compensate Plaintiffs for all hours worked, and for all hours worked at the appropriate straight-time rate and overtime rate, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq.*

2.      Plaintiffs are current and former drivers for Defendant, compensated on an hourly basis.  Throughout the relevant period, Defendant maintained a corporate policy of failing to

compensate drivers for all hours worked, including "wait time" hours during their scheduled shifts as well as hours up to forty (40) per week and hours in excess of forty (40) per week. Despite notifying Plaintiffs of their hourly rates, Plaintiffs and other similarly situated employees were only paid an hourly rate for certain hours worked and did not receive the appropriate premium overtime rate when their hours worked were in excess of forty (40) hours per week, in violation of the FLSA and NCWHA, and Defendant's obligation to compensate its employees for all hours worked.

3. Defendant was aware of Plaintiffs working generally in excess of forty (40) hours per week. Defendant suffered or permitted, and in fact, required Plaintiffs to work hours in excess of forty (40) hours per week without being compensated for time and a half (1.5) for their overtime work.

4. Defendant's practice of failing to compensate Plaintiffs at the appropriate minimum wage and overtime rate(s) for all hours worked violated Plaintiffs' rights under the FLSA and NCWHA.

5. Plaintiff brings this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class:

> All individuals who were, are, or will be employed by Defendant in North Carolina as drivers or in similar positions, at any time within the three (3) years prior to the date of commencement of this action, through the present, and who were not compensated for all hours worked and/or at the appropriate rate of one and one-half of their regular hourly rate for all hours worked in excess of forty (40) per week.

6. Defendant is liable for its failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

7. Plaintiffs who elect to participate in this FLSA collective action seek compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal

amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

8.     Plaintiffs also bring this action, on their own behalf, and as representatives of similarly situated current, former or future drivers, or similar positions, employed by Defendant in North Carolina, under the NCWHA.  Plaintiffs, who are North Carolina residents and who currently work or have worked for Defendant in North Carolina, assert that they and the putative class, who work or worked in North Carolina for Defendant, are entitled to compensation for all work performed for Defendant, whether the work week totaled greater or fewer than forty (40) hours, compensation at the appropriate regular or promised rate for hours worked less than 40 per week,  and/or the promised premium rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

9.     Additionally, throughout the relevant period, Defendant maintained a corporate policy of taking improper deductions from Plaintiffs' wages, including deducting the costs of uniforms from employees' wages, without obtaining the employees' prior written authorization as required by N.C. Gen. Stat. § 95-25.8.

10.     Plaintiff seeks class certification under Rule 23 of the Federal Rules of Civil Procedure for the following class of Defendant's employees in North Carolina:

> All individuals who were, are, or will be employed by Defendants in North Carolina as drivers or in similar positions, at any time within the two (2) years prior to the date of commencement of this action through the present, and who were not paid all of their wages on their regular pay date, and/or from whose wages Defendant deducted amounts, including for uniforms or uniform services.

11.     Plaintiffs, who are North Carolina residents and who worked for Defendant in North Carolina, assert that they and the putative class, who work or worked in North Carolina for

Defendant, are entitled to compensation for any earned and accrued unpaid wages for hours worked at the appropriate straight, promised, or overtime rates for hours worked at either less than or in excess of forty (40) per week and/or any illegal deductions from taken from their wages, and to an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.8, 95-25.6, 95-25.22(a), (a1), and (d).

## PARTIES

12. Plaintiff Christopher Hollis ("Plaintiff Hollis") is an adult resident of North Carolina, currently living in Raeford, North Carolina. Plaintiff Hollis worked as a full-time raw materials driver for Defendant at its Fayetteville, North Carolina, location from approximately July 7, 2019, until July 17, 2020. As a raw materials driver for Defendant, Plaintiff Hollis serviced Defendant's clients throughout the state of North Carolina, driving to Defendant's client locations and Defendant's various locations throughout the state of North Carolina.

13. Plaintiff Herman Purvis ("Plaintiff Purvis") is an adult resident of North Carolina, currently residing in Windsor, North Carolina. Plaintiff Purvis began his employment with Defendant on approximately April 2, 2018 and has worked and currently works for Defendant as a full-time raw materials and finished goods driver, based at Defendant's Lewiston, North Carolina, plant. In both roles, Plaintiff Purvis transported product to and from Defendant's clients throughout the state of North Carolina and Defendant's locations throughout the state of North Carolina.

14. Plaintiff Veraka Sturdivant ("Plaintiff Sturdivant") is an adult resident of North Carolina, currently residing in Morven, North Carolina. Plaintiff Sturdivant began her employment with Defendant on or about February 2019 and has worked for Defendant as a full-time raw materials and finished goods driver, based at Defendant's Wadesboro, North Carolina, plant. In

both roles, Plaintiff Sturdivant transported product to and from Defendant's clients throughout the state of North Carolina and Defendant's locations throughout the state of North Carolina.

15. Defendant Valley Proteins Inc. is one of the largest animal by-product rendering and recycling companies in the United States, headquartered in Virginia, and has its principal place of business located at 151 Valpro Road, Winchester, Virginia, 22603.

16. According to its website, Defendant provides services for the collection, rendering, and recycling of animal processing and supermarket waste streams (fat and bone trimmings; meat/poultry waste) and restaurant used cooking oil (UCO) throughout the contiguous United States.

17. According to its website, Defendant has over thirty (30) locations nationwide, including five (5) locations in North Carolina: Gastonia, Wadesboro, Fayetteville, Rose Hill, and Lewiston.

## JURISDICTION AND VENUE

18. The Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). Likewise, this Court also has jurisdiction over all of Plaintiffs' claims pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because there exists diversity of citizenship for purposes of CAFA and because the total amount in controversy exceeds $5 million. Such diversity exists as at least one member of the putative class is a citizen of a state other than the states of the Defendant's citizenship.

19. Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the NCWHA, because those state law claims arise out of the same nucleus of operative fact as the FLSA claims.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiff Sturdivant is a resident of Anson County, North Carolina, a county within this district, and Defendant conducted business within the Western District of North Carolina, including employing drivers, operating facilities located in Gastonia and Wadesboro, North Carolina, and servicing clients throughout this district.  Moreover, a substantial part of the events or omissions giving rise to these claims occurred in this District.

21.     All of the alleged causes of action can be determined in this judicial proceeding and this will provide judicial economy, fairness, and convenience to the parties.

## COVERAGE

22.     At all relevant times, Defendant was an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

23.     At all relevant times, Plaintiffs and all others similarly situated were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

24.     At all times material to this action, Defendant was an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000

## FACTUAL ALLEGATIONS

25.     Upon information and belief, Defendant employs more than 2,000 employees, including over 600 current drivers, around the United States. Five of these locations and hundreds of employees are located in North Carolina.

26.     Defendant specializes in the collection and recycling of inedible animal byproducts from primarily commercial operations, including meat processing plants and the food industry.  As Drivers, Plaintiffs are responsible for servicing Defendants' clients' collection needs.

27.     Defendant employs individuals, including Named and putative Plaintiffs, in various driver positions, including, but not limited to, raw materials drivers, finished goods drivers, "route" drivers, and/or grease trap drivers.

28.     Defendant did not compensate Plaintiffs for all hours worked, including hours up to forty (40) in a single workweek and/or hours worked over forty (40) that were worked in a given workweek, and did not a pay the promised regular rate and/or premium rate of time- and one-half or all wages that had accrued and were earned for such time worked.

29.     Raw materials drivers visit Defendant's client's locations, collecting animal renderings from the plants, primarily servicing more than forty (40) plants in North Carolina.  Raw materials drivers then take the renderings to a Valley Proteins plant, where the trailer loads of byproduct are then blended and "cooked," creating by product.

30.     Finished goods drivers then transport the by product, or finished goods, to customers for sale to be used in various products, such as dog food.

31.     Defendant also employs grease trap drivers, who pick up grease from various restaurants, including nationwide chains and locally owned establishments. Defendant also employs Route Drivers who are assigned dedicated pick-up and drop-off locations.

32.    Plaintiff Hollis worked for Defendant during the relevant time period as a raw materials driver.

33.    Plaintiff Purvis currently works for Defendant as a raw materials driver and a finished goods driver.  Plaintiff Purvis may transport finished goods at the beginning of a shift and then switch to transporting raw materials later in the shift.

34.    Similarly, Plaintiff Sturdivant works for Defendant as both a raw materials driver and a finished goods. Plaintiff Sturdivant may transport raw materials at the beginning of a shit and then switch to transporting finished goods later in the shift, or vice versa.

35.    Typically, Plaintiffs are scheduled to work up to seventy (70) hours per week, which is known was the "70-Hour Rule." The 70-Hour Rule allowed Defendant the ability to require a driver to work 70 hours in a week, if needed.  This typically results in Plaintiffs working approximately ten (10) to fourteen (14) hours each shift. However, as each shift's length depends on the various route assignments, the total hours worked in a week may vary.

36.    For example, Plaintiff Hollis typically works approximately five to six days a week, often working close to 68 hours in a week.

37.    Plaintiff Purvis typically works approximately five to six days a week, often working close to 58 hours in a week.

38.    Plaintiff Sturdivant typically works approximately six days a week, often working close to 61 hours in a week.

39.    Upon arriving at Defendant's warehouse approximately fifteen (15) to thirty (30) minutes prior to the start of their shift, Plaintiffs first check with a dispatcher in the traffic office, who assigns Plaintiffs a truck and/or trailer from Defendant's yard, as different routes require different trailer setups, and provides route instructions. Plaintiffs will then sign in by entering an

ID number in Defendant's computer and swiping a card and/or badge before beginning their pre-route routine. While Plaintiffs swipe in upon arriving to Defendant's facilities and are considered "on the clock" and ready to work, Plaintiffs are not compensated for any time spent prior to embarking on their assigned routes.

40.     After receiving their route and truck assignments, Plaintiffs then must sign out the trailer in Defendant's logbook, drive to the trailer yard, hook up the empty trailer to the truck, and perform a pre-trip inspection, including sanitizing the truck, checking fluids, fueling up, adding a tarp to the trailer, and generally ensuring the truck is in working order. Once the pre-route inspection is performed, Plaintiffs then return to the traffic office. On occasion, a dispatcher may also perform a brief inspection to ensure the truck and trailer are properly ready for road travel. This pre-route inspection may take anywhere from thirty minutes to two hours, depending on any issues that arise with the trailers and based on the trailer availability. Defendant does not consider pre-trip duties performed by Plaintiffs compensable time worked.

41.     Once Plaintiffs have completed the pre-route inspection, Plaintiffs then clock into the Omnitrack timekeeping system in the truck and begin their routes to transport the assigned loads. In one shift, Plaintiffs may be responsible for two to four loads.

42.     While en route, Plaintiffs must also track the amount of "wait time" during the shift, including time spent waiting at client facilities for trailers to be loaded with animal renderings. Depending on the client location and the renderings available, Plaintiffs could wait for the trailer to be filled anywhere from thirty minutes, which was rare, to over two hours, which was more common.

43.     After picking up a load from a client location, Plaintiffs return to Defendant's facilities, and then Plaintiffs weigh their truck load, drive to the "drain" area, where the water is

drained off the load, weigh the trailer again, have the trailer unloaded, and may, if needed, take the trailer through the wash bay. Depending on the remaining assignments on Plaintiffs' routes, they may either use the same trailer for the next assignment or Plaintiffs may have to drop off the trailer and pick up a new trailer for the next load. While time spent waiting for an available trailer is counted as "wait time," any time spent unloading a trailer or taking it through the wash bay is not factored in as "time worked."

44.     After completing their last stop and at the end of the shift, Plaintiffs are required to perform a post-trip inspection of the truck, refuel, and complete paperwork concerning the "wait times" and submit it to the dispatcher on duty. Plaintiffs are instructed to automatically deduct one hour from the actual wait times and are not permitted to report the actual wait time, as Defendant does not compensate Plaintiffs for the first hour of wait time. If Plaintiffs fail to deduct one hour of wait time from their time log, a dispatcher will cross out time in red ink or white-out the wait time reported by Plaintiffs and reduce the hours.

45.     At the end of the shift, Plaintiffs first sign out by swiping their card and/or badge and entering an ID number in Defendant's computer in the office and then log out of the Omnitrack system in the truck.

46.     Defendant compensates drivers, or similar positions, on an hourly basis. Defendant classifies these employees as non-exempt under the FLSA.

47.     Plaintiffs receive hourly pay as well as "load pay" and "Performance/Attendance" bonuses.

48.     Upon beginning their employment with Defendant, Plaintiffs were provided a copy of Defendant's handbook.

49.     Therein, Defendant's handbook defines hourly employees as "an employee whose position is considered 'non-exempt' under the provisions of the Fair Labor Standards Act and is paid on a weekly basis" and specifically identifies drivers as an example of hourly employees.

50.     Defendant's handbook further advises, "overtime compensation is paid to hourly employees after 40 hours of actual work each week" and that, for full-time employees, "overtime will be paid for hours worked in excess of 40 hours per week."

51.     In practice, Defendant provides drivers various hourly rates, including a regular hourly rate, a rate for "skilled labor," and a rate for "unskilled labor." For example, Plaintiff Hollis knows he was assigned a regular rate of $16.50 per hour, as documented on Defendant's payroll records, a "skilled labor" rate of approximately $18.00 per hour, and an "unskilled labor" rate of approximately $12.00 per hour.

52.     Similarly, Plaintiff Purvis received approximately $18.72 per hour for skilled labor, a regular hourly rate of $18.72, and $12.30 per hour for unskilled labor. Plaintiff Sturdivant received $21.08 per hour for skilled labor and $13.90 per hour for unskilled labor.

53.     Skilled labor includes the time Plaintiffs spent working with the trucks or trailers during a shift but only after Plaintiffs are en route, including if a truck or trailer had a maintenance breakdown or required repair while picking up or delivering a load.  The time Plaintiffs spent waiting for the truck to be repaired would qualify for pay at the "skilled labor" rate.

54.     Unskilled labor includes any time Plaintiffs spent waiting for the trailer to be filled while at the client sites or time Plaintiffs spent waiting for a trailer or truck to be repaired at Defendant's shop.

55.     In addition to these hourly rates, Plaintiffs received "load pay." Depending on the route assignments and amount of renderings or product transported, Plaintiffs could receive a "load

pay" ranging anywhere from approximately $75 to approximately $130. Additionally, Plaintiffs receive "Performance/Attendance" Bonuses ("PAB") each week, if they report to work on time for each scheduled workday and do not violate company rules. If a driver has an accident or a spill of renderings is reported, the driver may be subject to deductions from the PAB or may lose the PAB altogether. While "load pay" is supposed to be wages, in addition to Plaintiffs' hourly rates, the "load pay" typically amounts to the majority of Plaintiffs' wages and Plaintiffs' do not receive their hourly rates for all hours worked.

56. On weeks where Plaintiffs do not receive the complete PAB, Plaintiffs may receive a report from the traffic manager, which documents the partial or complete deduction from the PAB, as well as outlines the driver's hourly rate, total hours worked, and total hours paid per pay period. Without explanation, the documented hours paid could and would be less than the hours worked, pursuant to the pay summary generated and provided by Defendant.

57. Despite Plaintiffs being notified of their hourly rates and Defendant's guarantee to compensate Plaintiffs at a premium rate of one-and-one-half times their hourly rate for hours worked in excess of forty (40), Defendant did not compensate Plaintiffs a premium rate for hours over forty (40). Moreover, Defendant did not compensate Plaintiffs consistent with their promise, via Defendant's handbook, to compensate Plaintiffs all of their hours worked, including all hours worked up to forty (40) in a workweek at the promised hourly rate and/or any overtime at time and one-half for hours over forty (40) per week, or their earned and accrued wages on their regular pay date.

58. When Plaintiff Hollis inquired as to why he was never paid for his hours over forty (40) and why he was required to deduct one hour from his wait time, he was told "because you're a driver" and "it's cooked into load pay."

59.    When Plaintiff Sturdivant asked a dispatcher why drivers were required to deduct one hour from the wait time, she was told "that's just the way it is."

60.    Typically, though, Plaintiffs are hesitant to ask any questions regarding Defendant's policies to their direct managers, because if they ask too many questions, their manager will write them up and deduct from the PAB.

61.    Upon information and belief, despite Defendant not compensating Plaintiffs their promised hourly rates (whether it be straight-time or the premium rate for hours over forty), Defendant compensates drivers in Virginia at the promised straight-time rate for hours up to forty in a week and the promised premium rate for hours in excess of forty in a week, as provided for in Defendant's handbook.

62.    For one week where Plaintiff Hollis worked 68 hours and was not compensated all of the promised, regular rate or premium rate of one-and-one-half times his hourly rate, Plaintiff Hollis is owed at least $231, because Defendant maintained a policy that guaranteed hourly employees, specifically providing drivers as an example, a specific rate for hours worked up to forty in a single week and time and one-half that rate for all hours over 40.[1]

63.    Similarly, for one week where Plaintiff Purvis worked 58 hours and was not compensated all of the promised, regular rate or premium rate of one-and-one-half times his hourly rate, Plaintiff Purvis is owed at least $168.48, because Defendant maintained a policy that guaranteed hourly employees, specifically including drivers, a specific rate for hours worked up to forty in a single week and time and one-half that rate for all hours over 40.

---

[1] While Plaintiffs provide estimated damage calculations for one week for each named plaintiff, based on the limited information currently available to Plaintiffs, Defendant is in possession and control of necessary documents and information from which Plaintiff would be able to precisely calculate damages. Accordingly, the damage estimates provided in ¶¶ 62-64 capture *only* unpaid overtime for a single workweek, based on the limited information currently available to Plaintiffs and do not include the *unpaid* straight-time hourly wages Defendant also failed to compensate Plaintiffs.

64.     For example, for one week where Plaintiff Sturdivant worked 61 hours and was not compensated all of the promised, regular rate or premium rate of one-and-one-half times her hourly rate, Plaintiff Sturdivant is owed at least $221.34, because Defendant maintained a policy that guaranteed hourly employees, specifically including drivers, a specific rate for hours worked up to forty in a single week and time and one-half that rate for all hours over 40.

65.     Regarding uniform deductions, Defendant's employee handbook states, "The company requires a security deposit of $150 on uniforms, toolboxes, and other Company property issued to an hourly employee. This deposit will be deducted from an employee's payroll check in six installments of $25 each starting with the employee's fifth payroll check."

66.     In addition to these mandatory deductions outlined in the handbook, Plaintiffs are also deducted each week for "uniform services."

67.     However, Plaintiffs typically do not use the "uniform service" because they would not receive the same uniforms back from the service. For example, Named Plaintiffs, who prefer to not mix their uniforms with the other drivers' laundry, wash their uniforms at home and do not use the uniform service; yet, Plaintiffs are still required to pay for this service.

68.     Defendant neither received proper authorization from Plaintiffs to make any such deductions nor did Defendant provide Plaintiffs written notice of these deductions or the right to rescind any prior-obtained authorization, if any.

69.     In fact, when Plaintiff Hollis, who does not use the Valley Protein uniform service, asked to opt-out of the uniform deduction, he was told it did not matter if he used Defendant's uniform service or not and that he could not opt-out of the deduction.

70.     Similarly, Plaintiff Sturdivant was instructed it did not matter if she used the uniform service or not, the deduction would still be taken each week.

71.     On or about August 2020, a coalition of drivers, including Plaintiff Hollis, presented Defendant with a petition, outlining grievances regarding Defendant's employment policies.  Specifically, the petition explained that through conversations amongst the drivers and through educating themselves on industry standards, the Drivers complained and insisted Defendant change violative policies, including demanding compensation in accordance with the law.

72.     The Drivers requested, *inter alia*, reasonable work hours and limiting the total number of hours hourly paid employees may work in a single week, as well as demanding Defendant comply with the Fair Labor Standard Act, especially as it relates to unpaid driver wait time and tasks.  Additionally, the Drivers complained that any pay unlawfully withheld be paid retroactively to all affected employees.

73.     Despite receiving Plaintiff Hollis's and other drivers' grievances and/or complaints and efforts to seek change in Defendant's unlawful pay practices, Defendant has ignored such complaints and refused to compensate Plaintiffs for all hours works, including premium overtime pay at one- and one-half times their hourly rate in addition to all  other earned and accrued wages for all hours work at the appropriate, promised rate, including for all hours worked up to forty (40) at the promised rate and for all hours worked in excess of forty (40) in a week at the promised premium rate.

## FLSA COLLECTIVE ACTION ALLEGATIONS

74.     Named Plaintiffs bring the First Count of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and all similarly situated employees.

75.     Similarly situated employees, for purposes of the FLSA collective action claims, include individuals who were, are, or will be employed by Defendants as a Driver, at any time

within the three (3) year period prior to the date of the commencement of this action, through the present, and who did not receive compensation for all hours worked, including one- and one-half times their regular rate for all hours worked over forty (40) in a week.

76.     The members of the proposed collective action, like Named Plaintiffs, are employed as Drivers, including raw materials drivers, finished goods drivers, "route" drivers, and/or grease trap drivers, have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed at the appropriate rate.

77.     There are numerous (in excess of 100) similarly situated current and former Drivers that fall within the scope of the aforementioned FLSA class.

78.     The members of the proposed collective action are known to Defendant, are readily identifiable, and may be located through Defendants' records.

79.     Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Named and putative Plaintiffs.

80.     Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

81.     Pursuant to 29 U.S.C. § 216(b), attached to and filed with the instant Complaint as Exhibits A through C, are the Consents to File Suit as Named Plaintiff executed by Named Plaintiffs. As this case proceeds, it is likely other individuals will file consent forms and join as opt-in plaintiffs.

82.     Named Plaintiffs request that they be permitted to serve as representatives of those who consent to participate in this action, and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## NCWHA CLASS ACTION ALLEGATIONS
## PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

83.     Plaintiffs bring the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated employees, for relief to redress and remedy Defendant's violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq.*

84.     Numerosity:  The proposed class is so numerous that joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, the class comprises more than 100 individuals.

85.     Common Questions Predominate: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendant's failure to lawfully compensate them.  The common questions of law and fact include, but are not limited to, the following:

   a.   Whether Defendant provided any advance written notice of its intent to make wage deductions, including, for example, the cost of uniforms in the manner required by the NCWHA;

   b.   If Defendant did provide employees with any form of written notice of its intent to make wage deductions, whether the content of that notice complied with the technical requirements of the NCWHA;

c. Whether Defendant's practice of altering time logs to reduce recorded hours worked violates the NCWHA, given its result in failing to compensate putative Class Members all of their earned and accrued wages on their regular pay date;

d. Whether Defendant failed to compensate putative Class Members at the earned, accrued, and/or promised rate for all hours worked, up to forty (40) hours per week, in light of Defendant's failure to recognize "wait time" as hours worked;

e. Whether Defendants failed to compensate putative Class Members at the earned, accrued, and/or promised rate for all hours worked, including the promised rate for hours worked in excess of forty (40) each week; and

Whether Defendant failed to pay Named and Putative Plaintiffs all of their owed, earned, accrued, and promised wages, including, but not limited to, any straight-time or overtime wages, paid at the appropriate, promised rate, on their regular pay date, pursuant to N.C. Gen. Stat. § 95.25.6 and § 95-25.13, a requirement that is not covered by the overtime provision under the FLSA;

f. Whether Defendant knowingly deprived Plaintiffs of all accrued wages, including payment of wages that accrued consistent with the promised hourly rates for all hours worked, and is therefore unable to provide any good faith excuse for its failure to compensate Plaintiffs as required by § 95.25.6, § 95-25.13, § 95-25.22.

86. <u>Typicality</u>: The claims of Named Plaintiffs are typical of the claims which could be alleged by any member of the putative class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendant, as alleged herein, of failing to pay

employees for all hours worked or earned and accrued wages on their regular pay date, either at the appropriate straight or promised rates for all hours less than forty (40) per week or the appropriate promised rate for all hours worked in excess of forty (40) per week, and/or for Defendant's deduction policy, of failing to provide proper notice of intended deductions from employees' pay pursuant to N.C. Gen. Stat. § 95-25.8. Defendant's deduction policies and practices affected all putative Class Members similarly, and Defendant benefited from the same type of unfair and/or unlawful acts as to each putative Class Member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

87. <u>Adequacy of Representation</u>: Named Plaintiffs are able to protect the interests of all members of the proposed class fairly and adequately, including recovering all unpaid owed and accruing wages, and there are no known conflicts of interest between Named Plaintiffs and members of the proposed class. Named Plaintiffs have retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

88. <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing

the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims are treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Defendant, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

89. <u>Public Policy Considerations</u>: Defendant violated the NCWHA. Just as current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the Complaint a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

90. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiff and members of the proposed class.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of the Fair Labor Standards Act**
**29 U.S.C. § 201,** *et seq.*
**Brought by Named Plaintiffs on Behalf of Themselves and all Similarly Situated Employees**

91. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

92.     At all relevant times, Defendant has been, and continue to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

93.     At all relevant times, Defendant has employed, and continues to employ, "employee[s]," including Named Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

94.     At all relevant times, Defendant has had gross operating revenues in excess of $500,000.

95.     The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendant, to compensate all non-exempt employees at the applicable minimum wage rate for all hours worked, and at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of forty (40) hours in a single workweek.

96.     At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay Plaintiffs at the overtime rate for all hours worked in excess of forty (40) hours per week.

97.     Defendant's failure to pay Plaintiffs at the appropriate overtime rate for hours worked in excess of forty (40) per week, despite the fact that, upon information and belief, Defendant knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendant cannot show that it acted in good faith, and a three (3) year, rather than two (2) year statute of limitations will apply, since Defendant's acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

98.    As a result of Defendant's unlawful acts, Plaintiffs have been deprived of appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION
**Violation of the North Carolina Wage and Hour Act**
**N.C. Gen. Stat. § 95-25.1,** *et seq.*
**Brought by Named Plaintiffs on Behalf of Themselves and all Similarly Situated Employees**

99.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated here verbatim.

100.    At all relevant times, Defendant has employed, and/or continues to employ, Plaintiffs within the meaning of the NCWHA.

101.    Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and accrued promised wages, on the employee's regular payday.

102.    Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment as well as making available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2). Importantly, "[a]mbiguous policies and practices *shall* be construed against the employer and in favor of the employees." *See* 13 N.C. Admin. Code 12.0307.

103.    Plaintiffs' NCWHA claims are separate and distinct from Plaintiff's overtime claim under the FLSA, as Plaintiffs seek to recover all wages "accruing" for Plaintiffs and putative class members, who are hourly-paid employees, within the meaning of N.C. Gen. Stat. § 95-25.6, by virtue of Defendant's agreement to pay for all hours worked, regardless of whether these

employees were also owed overtime pay under the FLSA, and Defendant systemically failed to compensate Plaintiffs for all hours worked.

104.    Defendant employed Named Plaintiffs and similarly situated employees, within the State of North Carolina. Plaintiffs and putative Rule 23 class members were employed by Defendant within the meaning of the NCWHA and were not exempt from the statute's provisions.

105.    Upon Plaintiffs beginning their employment, Defendant informed Plaintiffs of their hourly rate and of Defendants' policy and practice to compensate Plaintiffs for all hours worked in excess of forty (40) per week at a rate of one and one-half times the promised hourly rate.

106.    Explicitly, Defendant, pursuant to its handbook, guarantees and promises that for all full-time employees, without qualification, "Overtime will be paid for hours worked in excess of 40 hours per week." Despite this clear promise and Plaintiffs regularly working upwards of 70 hours a week, Defendant did not compensate Plaintiffs any overtime wages.

107.    Defendant agreed to pay hourly-paid employees, including Plaintiffs, for all hours worked, as evidenced by Defendant assigning Plaintiffs hourly rates, compensating Plaintiffs based on hours worked, including wait time, and instructing Plaintiffs to use Defendant's time-keeping system in order to be paid.

108.    At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay Plaintiffs all owed, earned, accrued, and promised wages, including for required work performed by Plaintiffs, and at the appropriate rate to which Plaintiffs are lawfully entitled for hours worked up to forty (40) *and* hours in excess of forty (40) in a single workweek.

109.    Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendant promised to pay Named Plaintiffs and putative class members for all of their hours worked, pursuant to Defendant's handbook all wages, when due, for all promised, earned, and accrued

regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

110. Defendant violated N.C. Gen. Stat. § 95-25.6 by failing to pay Plaintiffs wages accrued for all hours worked, including, but not limited to, all "wait time" performed by Plaintiffs as well as all promised wages that accrued pursuant to Defendant's policy to compensate full-time employees, such as Plaintiffs, for all hours worked in excess of 40 at one and one-half times the promised hourly rate.

111. Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.8, it is unlawful for an employer to withhold any portion of an employee's wages without the employee's advance written authorization, including the amount and reason for the deduction. If the amount is not available when the employee signs the authorization, the employer must receive advance written notice of the exact amount and of the right to withdraw the authorization.

112. Each week, Defendant took deductions from Named Plaintiffs' and putative Class Members' for uniform fees.

113. At all relevant times, Defendant, pursuant to its policies and practices, deducted a portion of employees' wages for the cost of uniforms without receiving the required advance written authorization and without providing advance written notice of the amount to be deducted.

114. Consistent with the above, Defendant's wage withholding was in violation of N.C. Gen. Stat. §§ 95-25.6 and 95-25.8.

115. As a result of Defendant's unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

116. Defendants intentionally refused to pay all wages due as set forth in the preceding paragraphs of this Complaint to Plaintiffs and putative class members in violation of the NCWHA.

117. Defendants were aware that Named Plaintiffs and putative class members were not receiving all straight-time wages for all hours worked up to forty (40) pursuant to the promised straight-time rate and all wages for hours worked in excess of forty (40) per week per week pursuant to the promised premium rate of one-and-one-half times the straight-time rate.

118. Even after Plaintiff Hollis and putative class members presented a formal petition demanding payment of all earned and accrued wages, including for all hours worked, Defendant refused to comply with its obligations under the NCWHA.

119. Defendant's failure to pay Plaintiffs all owed, earned, accrued, and promised wages, despite the fact that, upon information and belief, Defendant knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

120. As a result of Defendant's unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs, and all those similarly situated, collectively pray that this Honorable Court:

1. Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiffs as the representatives of all those similarly situated under the FLSA collective action;

2.     At the earliest possible time, issue notice of this collective action, or allow Named Plaintiffs to do so, to all persons who were, are, or will be employed by Defendant in North Carolina as drivers or in similar positions, at any time within the three (3) years prior to the date of commencement of this action, through the present, and who were not compensated for all hours worked and/or at the appropriate rate of one and one-half of their regular hourly rate for all hours worked in excess of forty (40) per week.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

3.     Issue an Order certifying this action as a class action under the NCWHA, and designate Named Plaintiffs as representatives on behalf of all those similarly situated under the NCWHA class and designate the below undersigned counsel as class counsel;

4.     Award Plaintiffs actual damages for unpaid wages and liquidated damages equal in amount for the unpaid compensation found due to Named Plaintiffs and the class as provided by the FLSA, 29 U.S.C. § 216(b); award Plaintiffs actual damages for unlawfully withheld wages, including earned and accrued wages, and liquidated damages equal in amount as provided by the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (a1);

5.     Award Plaintiffs attorneys' fees, costs, and interest pursuant to the FLSA, U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a), (d);

6.     Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

7.  **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this March 19, 2021.

/s/ Gilda Adriana Hernandez
Gilda A. Hernandez (NCSB No. 36812)
Charlotte Smith (NCSB No. 53616)
**THE LAW OFFICES OF GILDA A.**
**HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Phone: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
csmith@gildahernandezlaw.com

*Attorneys for Plaintiff*